**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **STATE FARM FIRE AND** | ) | |
| **CASUALTY COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO 08-0193-KD** |
| | ) | |
| **JOHN AGEE and** | ) | |
| **SHANITA SHAMBURGER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment as to Defendants' Counterclaim (Docs. 32, 33, 34, 35, 40, 43), Defendants' Response in opposition (Doc. 39),  Plaintiff's Reply to Defendants' Response (Doc. 44) and Plaintiff's Motion to Strike Factual Statements from Defendants' Response to Plaintiff's motion (Doc. 46).  Upon consideration, the Court finds that Plaintiff's Motion for Partial Summary Judgment is due to be **GRANTED** and that Plaintiff's Motion to Strike is **MOOT.**

**I.      Procedural Background**

Plaintiff is State Farm Fire and Casualty Company ("Plaintiff"), an Alabama corporation with its principal place of business in Illinois.  (Doc. 1).  Defendants are John Agee ("Agee") and Shanita Shamburger ("Shamburger"), common-law husband and wife and Alabama residents.  (Id.)

Plaintiff initiated this litigation on April 14, 2008, asserting that the Court has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 and seeking entry of a declaratory judgment

regarding State Farm's obligations under an insurance policy issued to the defendants.  Specifically, Defendants have submitted a sworn Proof of Loss claiming benefits from the insurance policy, but Plaintiff contends the policy is void and no benefits are owed with regard to a October 2007 fire loss sustained at the insured dwelling.  Plaintiff's contention is based upon Defendants' alleged misrepresentation and concealment before and after the loss as well as suspicious circumstances surrounding the fire.  (Id.).  On July 15, 2008, Defendants filed their Answer and asserted Counterclaims against Plaintiff for breach of contract, bad faith, misrepresentation, suppression and negligence.  (Doc. 9).

## II.   __Relevant Factual Background__

This case concerns an insurance coverage dispute.  Specifically, Defendants had a 2002-2003 homeowners policy issued by Plaintiff for real property in Arlington, Alabama, but on June 22, 2003, Defendants' policy was canceled for non-payment of premium.  (Doc. 1).  On July 7, 2004, Defendant Agee telephonically contacted Plaintiff through its agent the T.K. Smith Agency.  (Doc. 43 at Ex. A at ¶ 2).  Defendant Agee sought to reinstate or renew the previous homeowners insurance policy that he had with Plaintiff.  (Doc. 39 at Ex. A at 26-27, 30, 32-34, 49, 134-35).  Defendant Agee spoke with Ericka Jackson, an office employee of Plaintiff's agent.  (Id.  See also Doc. 39 at Ex. B at 26-29, 69).  Plaintiff alleges that during this telephone conversation Defendant Agee was asked by Jackson whether he had suffered any losses within the past three years, insured or uninsured, and that he responded "no" to that question.  (Doc. 1 at 3).  Plaintiff asserts that, relying on Defendant Agee's representation, Plaintiff then issued the policy (Policy #01-GF-0975-

7)[1] effective July 7, 2004, insuring Defendants' property in Arlington, Alabama. (Id.). Plaintiff provided insurance to the dwelling with limits of $362,000 and insurance to contents with limits of $271,500. (Id.). Sections I-II of the policy, "Conditions, Concealment of Fraud," states in relevant part that: "[t]his policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss." (Doc. 33 at Ex. V at 19).

Defendants dispute Plaintiff's allegations with regard to this telephone conversation with the insurer. Defendant Agee testified that during this phone call he was only asked for his name and the location and condition of the home, and that he answered those questions truthfully. (Doc. 39 at Ex. A at 32-34). See also (Doc. 9 at 5).[2] He further testified that he was not asked by Jackson about any prior losses, and moreover, made no statements regarding same. (Doc. 39 at Ex. A at 32-34). Defendant Agee stated that he suffered a fire loss at a different home on October 1, 2003, as well as a fire loss (date unknown) at a pool hall that he operated but did not own. (Id. at 38-41, 43, 50-51; Doc. 33 at Ex. A at 53). He asserts that if he had been asked about any prior losses by Plaintiff, he would have listed these. Defendant Agee testified that he never saw his completed application and had no opportunity to review the information placed on it by Jackson. (Doc. 39 at Ex. A at 26-27).

---

[1] Defendants state that this policy number is the same number as the policy that Agee previously had with Plaintiff from 2002-2003, on the very same dwelling, such that Plaintiff believed that he had simply renewed or reinstated the former policy. (Doc. 39 at Ex. A at 26-27, 30, 32-33). In contrast, Plaintiff asserts that because the policy had been terminated in June 2003 and was out of force more than 30 days, the 2002 policy could not be reinstated. (Doc. 33 at Ex. D at ¶ 4).

[2] Defendant Agee testified that Plaintiff's agent, Jackson, just "used what they already had[]" as far as information to put on the application such as the dwelling and contents amount, that he was not asked about it, and that there was no discussion about such items over the phone. (Doc. 39 at Ex. A at 135).

On October 7, 2007, Plaintiff had in force and effect the homeowners insurance policy with Defendants.  (Doc. 33 at Ex. D at ¶ 5).  On this date, while Defendants were out of state, a fire completely destroyed the home and its contents.  (Doc. 39 at Ex. A at 86-88, at Ex. C at 13-14).  See also (Doc. 9 at 6).  When the fire department arrived on the scene the house was already completely engulfed in flames.  Thus, the decision was made to allow the fire to burn itself out and no attempts to extinguish the fire were made.  (Doc. 39 at Ex. D at  27, 32, at Ex. J at 86).  On October 8, 2007, Defendants reported the loss and filed a claim with Plaintiff for benefits pursuant to the terms of the homeowners insurance policy.  Defendants also completed Proof of Loss forms, listing items which were in the home at the time of the fire.  (Doc. 33 at Ex. H at nos. 5-9, at Ex. I at 18; Doc. 39 at Ex. C at 14-15, 34-36).

On October 8, 2007, Plaintiff's representative Anthony Fimiano ("Fimiano") inspected the property (took photographs, took a recorded statement, completed a diagram and filled out an exemplar personal property inventory form), and on October 11, 2007, determined that the home and its contents were a total loss.  (Doc. 33 at Ex H at no. 30; Doc. 39 at Ex. A at 136, at Ex. G at 19).  Fimiano issued Defendant Agee an advance and recommended to Plaintiff that a cause and origin expert be retained to investigate the fire.  (Doc. 33 at Ex. I at 16, 20, 23).  Claim Representative Pat Craig ("Craig") scheduled an appointment for cause and origin expert Harold Deese ("Deese") to inspect the property on October 15, 2007.  (Doc. 33 at Ex. H at no.16).

On October 16, 2007, cause and origin expert Deese inspected the property with Defendant Agee present.  (Doc. 33 at Ex. A at 93, at Ex. H at no. 36, at Ex. J at 2; Doc. 39 at Ex. D at 9, 16).  During the inspection, Deese and Defendant Agee walked through the remnants of the home discussing content items which were in the home at the time of the fire.  Deese reported that the fire

started in the living room, that some large items, such as the pool table and several televisions, were

missing, and that there was an unusual burn pattern on an area of steps leading to the garage.  (Doc.

33 at Ex. A  at 93-94, at Ex. J; Doc. 39 at Ex. D at 16-17, 21-22).  Deese testified that a lot of the

items that he did not see evidence of in the remains were the type of items that someone might take

in a burglary.  (Doc. 39 at Ex. D at 15).  Deese also testified that in "this particular fire, it was

feasible[]" that the pool table and pool balls burned up without leaving any evidence.  (Id. at 22).

The test results from his sample of the unusual burn pattern came back negative for combustible or

flammable liquid.  (Id. at 16-17).

On October 16, 2007, Craig met with Defendant Agee at the insured property and Defendant

Agee told Craig about the previous two fires at other locations.  (Doc. 33 at Ex. H at no.38; Doc. 39

at Ex. E at 17, at Ex. J at 62-63).  Defendant Agee also testified that when asked about items claimed

as loss for which no evidence was found, he told Craig that shortly after the fire he had seen people

rummaging through the remains and then pull away in a scrap truck.   (Doc. 39 at Ex. A at 109-10).

Craig also met with Arlington Fire Chief Robbie McGilberry ("McGilberry"), who informed

him about the events that transpired on the night of the fire and advised Craig that Defendant Agee

had prior fire losses on a residence and a bar.  (Doc. 33 at Ex. H at no.36; Doc. 39 at Ex. J at 62).

Craig investigated the information provided by McGilberry and discovered the October 2003 fire

to Agee's residence as well as the fire to a commercial business, P&J Bar and Grill, in 2006.[3]  (Doc.

33 at Ex. H at no. 37; Doc. 39 at Ex. J at 62).  Craig contacted State Farm Underwriting and learned

---

[3]  Defendant Agee testified that he owned the P&J Bar and Grill business but not the building (he
had leased the property) but that he was responsible for the insurance on the building and its contents.
(Doc. 33 at Ex. A at 50-53).  Defendant Agee testified that he obtained insurance on the bar and that one
week later, the bar was destroyed in a fire; he received $110,000-120,000 in insurance benefits ($80,000
for the contents and approximately $30-40,000 for a portion of the building coverage).  (Id. at 53-55).

that Defendant Agee's 2004 application stated that he had not suffered any prior losses in the prior three years.  (Doc. 33 at Ex. H at no. 37).  Craig then contacted Jackson, who stated that she always asks all of the questions on the application and did ask Defendant Agee about prior losses.  (Id.).

On October 18, 2007, Craig contacted cause and origin expert Michael Kennedy ("Kennedy") and scheduled an appointment for Kennedy, for October 24, 2007, to inspect the dwelling and sift through the debris to determine the contents lost in the fire.  (Doc. 33 at Ex. H at no.50; Doc. 39 at  Ex. H at 14).

On October 24, 2007, Plaintiff issued a "reservation of rights" letter to Defendant Agee, stating that a question existed as to whether there had been a material misrepresentation regarding his application for insurance with regard to prior losses within the last three years; the fire loss that prompted Plaintiff to issue the letter was the 2003 fire loss occurring at the residence he had been remodeling.  (Doc. 33 at Ex. L; Doc. 39 at Ex. J at 72).  On October 25, 2007, Defendant Agee contacted Fimiano about the "reservation of rights" letter, asking for it to be explained to him.  Fimiano advised that during the course of the investigation it was determined that on the insurance application Agee had not reported prior fire losses but, in actuality, Agee  had prior fire losses.  (Doc. 33 at Ex. H at no. 70, at Ex. I at 44-45; Doc. 39 at Ex. J at 60-61).

On October 26, 2007, Defendant Agee again called Fimiano.  Fimiano informed him that Plaintiff was in the process of securing him temporary housing in a mobile home[4] and that he would have to pay the $2,500 security deposit because it was refundable and not an expense.  (Doc. 33 at Ex. H at no. 76).  Fimiano told Defendant Agee that he could advance him $2,500, but that the

---

[4]Defendant Agee purchased a renters' insurance policy from Plaintiff on the mobile home.  (Doc. 39 at Ex. A at 132, at Ex. C at 50-51, 54-55).

advance would go towards any future contents settlement.  Defendant Agee agreed.  (Id.).

Between the time of the loss being reported and November 12, 2007, Defendant Agee submitted personal property inventory forms (PPIFs) listing a 55-inch television and 61-inch television.  Deese had stated that evidence of these items was not present when he inspected the property. (Doc. 33 at Ex. K at 21-22, at Exs. M and N).  On November 12, 2007, Kennedy inspected the residence to perform a contents inventory to verify the Proof of Loss.  (Doc. 33 at Ex. H at nos. 50, 64, 76, 98, 100; Doc. 39 at Ex. H at 15).  Some of the content remains that Kennedy was unable to locate included a DVD player (no metal chassis remains); a 55-inch television (no steel frame or projection remains); an antique wooden grandfather clock (no time piece portions, no brass gears, no chain or cable remains); a seven-in-one multigame table; a 61-inch projection television (no steel frame or projection remains); a sit-under hair drier or curlers (no metal heating element remains); three umbrellas (no metal remains); a laptop (no steel subframe remains); a pool table (no corner joint remains or pool balls); a 32-inch television (no metal remains); a digital camcorder (no steel remains); a vacuum cleaner (no steel remains); his and hers watches (no steel back remains); diamond tennis bracelet (no diamonds in remains); 50 DVDs; antique iron (no steel remains or heating elements); and a Harmony acoustic guitar (no metal key mechanism remains).  (Doc. 39 at Ex. H at 19-45, 57).

On November 20, 2007, Deese issued his fire investigation report for the insured property. (Doc. 33 at Ex. J).  Deese concluded that the fire occurred in the living room and that due to the amount of destruction caused by the fire and the fact that no water was used to extinguish the blaze, "the exact cause of fire cannot be determined."  (Id. at 2).  However, Deese added, not as a conclusion but within the body of his report, that based on the data collected and the fire scene

examination, the "possibilities of this fire being an incendiary act cannot be eliminated." (Id. at 6).

Deese also noted that some major content items that were claimed as lost were not found, including

a router, small hand tools, a television and a pool table in the garage; a 50-inch television; an

amplifier, projector, and large screen in the family room; two metal dining room chairs and a 61-

inch television. (Id. at 4). Deese testified that it was possible that some of the larger content items

(like the pool table and pool table balls) that were missing could have been completely burned up,

as no efforts were made to extinguish the fire. (Doc. 33 at Ex. K at 21-22). Referencing Deese's

expert cause and origin fire report, Angela Pierce, Plaintiff's representative and Team Manager who

issued the "reservation of rights" letter, testified that there is no proof cited in the report that would

relate the origin of the fire to arson. (Doc. 39 at Ex. J at 86).

On November 27, 2007, Craig took a recorded statement from Defendants regarding the fire

loss. (Doc. 33 at Ex. B). Defendant Agee stated that he did not go through any type of application

over the phone in July 2004, but that "[t]hey asked me did I still work at the same place and that was

basically all the information . . . [t]hat they really asked me about." (Id. at 2-3). Defendant Agee

stated that he was not asked about prior losses or anything like that and moreover, that he told them

he just wanted to renew the policy. (Id. at 3). Defendant Agee also stated that in the past year he

has had burglaries and thefts at the residence, including having a car, a trailer, a weed eater and a

lawnmower stolen. (Id. at 19-21).

On December 3, 2007, Defendant Shamburger went to Plaintiff's office and submitted a

Proof of Loss completed by Defendants, claiming the total amount of contents lost as $271,000, but

Defendant Shamburger did not have the PPIFs to substantiate this amount. (Doc. 33 at Ex. H at no.

148). Craig told Defendant Shamburger that the Proof of Loss needed to be supported by the PPIFs,

so she would have to complete the PPIFs and then submit the Proof of Loss.  (Id.).  On December 11, 2007, Defendant Shamburger returned with the Proof of Loss with a change on same; the $271,000 figure had been changed to $149,000.  (Doc. 33 at Ex. H at nos. 148, 151).  Defendant Shamburger had initialed the change but Defendant Agee had not, and the change was made after the original Proof of Loss had been notarized.  As such, Craig told Defendant Shamburger that a new Proof of Loss would need to be submitted so that there would be no changes on the notarized form. (Id.).

On December 13, 2007, Plaintiff's claim representative Pam Donovan ("Donovan") contacted agent Patrick Wright ("Wright") at the West Alabama Insurance Agency regarding the house fire that took place in October 2003.  (Id. at no.153).  Wright informed Donovan that the claim had been marked as a "suspicious claim".  (Id.).  The cause and origin of the fire could not be determined, however, so Zurich paid $157,000 on the claim.  (Id.).

On December 27, 2007, Defendant Agee went to Plaintiff's office, and Chris Robinson ("Robinson") returned the original Proof of Loss and provided Defendant Agee with a new form, instructing him to complete it so there would be no handwritten changes.  (Id. at no.170). On January 9, 2008, Plaintiff's Team Manager Angela Pierce issued a second "reservation of rights" letter to Defendant Agee, which mirrored the October 24, 2007, letter regarding failure to disclose prior losses within the prior three years on his 2004 application.  (Doc. 33 at Ex. P).  On January 9, 2008, Plaintiff's representative Robinson spoke with Defendant Agee concerning his Proof of Loss, and on January 11, 2008, Defendants came into his office to complete the Proof of Loss and submitted an additional inventory list.  (Doc. 39 at Ex. F at 38).  On January 15, 2008, Kennedy submitted his report to Plaintiff in which he stated that he did not find the 55-inch television or the 61-inch

projection television (or its sound system) that Defendants listed on the PPIFs.  (Doc. 33 at Ex. H at no. 179).

On January 18, 2008, Craig met with Defendants in the State Farm office to discuss their PPIFs and Kennedy's findings.  Craig asked about the sound system, stating it was not listed on the PPIFS and informing them that if there was one (which Defendants asserted) that they needed to include it on the PPIFs.  (Id. at no. 180).  Defendant Agee stated that he would do that, to which Craig then stated that they were also unable to locate the sound system in the fire debris.  Defendants could offer no explanation as to why it was not located in the debris.  (Id.).  While processing Defendants' claim, Plaintiff paid $29,181.46 in Additional Living Expenses ("ALEs") to or on their behalf. [5]  Plaintiff discontinued paying ALEs when it filed the present Complaint.  (Doc. 33 at Ex. A at 122-123, at Ex. H at nos.158, 203).

In February 2008, State Farm underwriting team manager Malik Bland ("Bland") was contacted by Claims Team Manager Angela Pierce ("Pierce") to discuss whether Plaintiff would have issued the 2004 policy if Defendant Agee had disclosed the October 2003 fire loss.  (Doc. 33 at Ex. S).  Pierce took a recorded statement in which Bland stated that if Plaintiff had known about the prior fire loss, it would have declined the application and would not have issued the policy because Defendants would have been ineligible.  (Id.).  On March 31, 2008, a claims committee met electronically to discuss Defendant Agee's claim.  The committee recommended that the claim be

---

[5]Defendants first moved into a hotel and Plaintiff paid the hotel directly.  Defendants then moved to a family member's home who charged them $250/week in rent; this figure was also taken into account when Plaintiff paid the ALEs.  (Doc. 33 at Ex. H at no.136, at Exs. Q and R).  Defendants eventually moved into a mobile home and Plaintiff paid for the initial set up of the mobile home and took into account the rent being charged by the mobile home provider when calculating the amounts.

denied based on misrepresentation before and after the loss.  (Doc. 33 at Ex. H at nos. 231-32).  On

April 3, 2008, Pierce issued a third "reservation of rights" letter to Defendants.  (Doc. 33 at Ex. U).

III.   **Analysis**

   A.      **Applicable Law**

   Summary judgment should be granted only if "there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).[6]  The

party seeking summary judgment bears "the initial burden to show the district court, by reference

to materials on file, that there are no genuine issues of material fact that should be decided at trial."

Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The party seeking summary

judgment always bears the "'initial responsibility of informing the district court of the basis for its

motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any," which it believes demonstrate the absence

of a genuine issue of material fact.'"  Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her

case with respect to which she has the burden of proof," the moving party is entitled to summary

judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its

burden, the court must stop short of weighing the evidence and making credibility determinations

---

   [6]  Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be
granted:

>    if the pleadings, the discovery and disclosure materials on file, and any affidavits show
>    that there is no genuine issue as to any material fact and that the movant is entitled to
>    judgment as a matter of law.

FED. R. CIV. P. 56(c).

11

of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. denied, 507 U.S. 911 (1993) (internal citations and quotations omitted).  The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v. Sec'y of the Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004), cert. denied, 543 U.S. 1081 (2005).

> ### B.   Discussion

> #### 1.   Negligent Claim Handling

Plaintiff asserts that Defendants' Counterclaim for negligence (namely, what appears to be negligent claim handling) is due to be dismissed because there is no such cause of action in the State of Alabama.  Plaintiff is correct.  As noted in Kervin v. Southern Guar. Ins. Co., 667 So. 2d 704, 706 (Ala. 1995) (emphasis added), Alabama does not recognize a cause of action for negligent and wanton claim handling:

> . . . . **this Court has consistently refused to recognize a cause of action for the negligent handling of insurance claims, and it will not recognize a cause of action for alleged wanton handling of insurance claims**. See Pate v. Rollison Logging Equipment, Inc., 628 So. 2d 337 (Ala.1993); Armstrong v. Life Insurance Co. of Virginia, 454 So. 2d 1377, 1380 (Ala.1984), overruled on other grounds by Hickox v. Stover, 551 So. 2d 259, 264 (Ala.1989); Chavers v. National Security Fire & Casualty Co., 405 So. 2d 1 (Ala.1981); Calvert Fire Ins. Co. v. Green, 180 So. 2d 269 (1965). The summary judgment was proper on this claim . . . .

See also, e.g., Gardner v. First Premium Ins. Group, No. 06-0694-WS-M, 2007 WL 1283999, at *2 (S.D. Ala. Apr. 30, 2007) (stating that "[t]he Alabama Supreme Court 'has consistently refused to recognize a cause of action for the negligent handling of insurance claims, and it will not recognize a cause of action for alleged wanton handling of insurance claims[]'"); Alverson v. Auto-Owners

Ins. Co., No. 06-0866-WS-M, 2007 WL 437601, at *2 (S.D. Ala. Feb. 6, 2007) (noting that Alabama does not recognize negligent handling of an insurance claim, instead limiting an insurer's exposure to a claim for bad faith).  Accordingly, Plaintiff's motion for summary judgment, with regard to Defendants' counterclaim for negligent claim handling, is **GRANTED.**

2.      <u>Fraudulent Misrepresentation and Suppression</u>

With regard to Defendants' counterclaims for fraudulent misrepresentation and suppression, Defendants have failed to address Plaintiff's motion as to these counterclaims.  "In opposing a motion for summary judgment, 'a party may not rely on his pleadings to avoid judgment against him.'"  <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 592 (11th Cir. 1995).  Nevertheless, courts cannot base entry of summary judgment solely on the mere fact that a motion was unopposed; rather, courts must also consider the merits of the motion.  <u>See</u>, <u>e.g.</u>, <u>United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.</u>, 363 F.3d 1099, 1101-1102 (11th Cir. 2004) (citing <u>Dunlap v. Transamerica Occidental Life Ins. Co.</u>, 858 F.2d 629, 632 (11th Cir. 1988) (per curiam)).  While courts need not *sua sponte* review all of the evidentiary materials on file at the time the motion is granted, courts must ensure that the motion itself is supported by evidentiary materials. <u>Id.</u> at 1101.  At the least, the district court must review all of the evidentiary materials submitted in support of the motion for summary judgment.  <u>Id.</u> at 1101-02.  In addition, so that there can be an effective review of the case on appeal, a court's order granting summary judgment must "indicate that the merits of the motion were addressed."  <u>Dunlap</u>, 858 F.2d at 632.  In sum, "where the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law,'" summary judgment would be appropriate.  <u>One</u>

13

Piece of Real Prop., 363 F.3d at 1101.  See also Trs. of the Cent. Pension Fund of the Int'l Union

of Operating Eng'rs &  Participating Employers v. Wolf Crane Serv., Inc., 374 F.3d 1035, 1040

(11th Cir. 2004) (vacating and remanding the district court's grant of summary judgment, in part,

"[b]ecause summary judgment cannot be granted as a sanction for merely failing to file a response

to a motion for summary judgment[.]").

a.    Fraudulent Misrepresentation

Defendants contend that Plaintiff falsely represented to them that it was processing and

adjusting their claim in a timely manner, but then failed to do so.  (Doc. 9).  To prevail on this claim,

Defendants must prove: 1) a false statement; 2) concerning a material existing fact; 3) reliance upon

the false statement; and 4) damage as a proximate result of relying upon the false statement.  See,

e.g., Ex parte Novartis Pharms. Corp., 991 So. 2d 1263, 1275 (Ala. 2008); Boswell v. Liberty Nat'l

Life Ins. Co., 643 So. 2d 580, 581 (Ala. 1994).  Plaintiff contends that Defendants can point to no

evidence that it failed to process and adjust the claim in a timely manner, thus no false statement was

made which has damaged the defendants.  (Doc. 34 at 13-16).  The Court agrees.  There is no

evidence in the record indicating that Plaintiff made a false representation that it would process and

adjust Defendant Agee's claim in a timely manner, but then did not do so (as Defendants allege is

the basis of this claim).  In contrast, assuming *arguendo* that Plaintiff did represent to Defendant

Agee that the claim would be processed in a timely manner, the evidence of record (particularly

Plaintiff's Activity Log) reveals that the investigation of Defendant Agee's fire loss commenced

immediately upon report of the loss, and the claim continued to be consistently processed (and

Defendants continued to be paid for expenses and advanced money) even after Plaintiff believed that

Defendant Agee had misrepresented information on his 2004 insurance application and issued a

14

"reservation of rights" letter. (Doc. 33 at Ex. H ).

Specifically, the fire occurred on October 7, 2007.  Plaintiff's representative  Fimiano became involved in Defendant Agee's claim on the very day the loss was reported – October 8, 2007 – and moreover, actually inspected the residence that same day and provided Defendant Agee with an advance as well as blank PPIFs to complete with an exemplar of how to do so.  Fiamiano then submitted a report on October 11, 2007.  (Id. at nos. 14, 30, 32).  See also (Doc. 33 at Ex. I at 18). On October 15, 2007, cause and origin expert Deese inspected the residence.  (Doc. 33 at Ex. H at no. 36).  Plaintiff continued to investigate the fire loss even after issuing a "reservation of rights" letter on October 24, 2007 (issued after it discovered the prior 2003 fire loss).  (Doc. 33 at Ex. L). On October 25, 2007, Fimiano and Defendant Agee discussed the letter over the telephone and Fimiano informed him about the 2004 application stating that there had been no prior losses even though he had a loss in 2003.  (Doc. 33 at Ex. I at 44-45).  Nevertheless, Plaintiff continued processing Defendant Agee's claim (issuing advances, securing housing, continuing to pay for ALEs, etc.) and Plaintiff submitted his PPIFs and Proof of Loss.  (Doc. 33 at Ex. A at 121, at Ex. Q).  In January 2008, Plaintiff issued a second "reservation of rights" letter to Defendant Agee, stating similar language to the October 2007 letter.  (Doc. 33 at Ex. P).  Plaintiff's Activity Log shows that Defendant Agee's claim was still actively being processed between October 2007 and January 2008.  (Doc. 33 at Ex. H).  Indeed, Plaintiff never issued a denial letter refusing to pay Defendant Agee's claim.  Rather, Plaintiff continued to process Defendant Agee's claim up until the time that his claim was submitted to committee in late March 2008, and then the decision to file the present declaratory judgment action was made.  As such, the record does not support a finding that Plaintiff falsely represented that it would process and adjust Defendant Agee's claim in a timely

15

manner but then failed to do so.

Moreover, there is no evidence of reliance on the part of Defendants on any such misrepresentation. Specifically, there is no evidence of record indicating that Agee or Shamburger changed their position or would have acted any differently. See, e.g., Hunt Petroleum Corp. v. State, 901 So. 2d 1, 4 (Ala. 2004); Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So. 2d 1143, 1160 (Ala. 2003). Further, there is no evidence of record with regard to any damage to Defendants. Accordingly, Plaintiff's motion for summary judgment, with regard to Defendants' counterclaim for fraudulent misrepresentation, is **GRANTED**.

b.    Suppression

Defendants contend that after they filed their claim, Plaintiff willfully, wantonly, fraudulently or recklessly suppressed the following material facts in violation of Ala. Code § 6-5-102: that it was going to delay the claim; that it was not going to properly investigate the claim; and that it was not going to adequately adjust the claim. (Doc. 9 at 11-12). Defendants contend that Plaintiff had a duty to disclose these material facts but instead suppressed and concealed them such that, without knowledge of said facts, Defendants then acted to their injury and were damaged. (Id. at 12). In essence, Defendants appear to assert that Plaintiff suppressed the company's internal operating procedures for handling claims. See, e.g., King v. Nat'l Found. Life Ins. Co., 541 So. 2d 502, 505 (Ala. 1989).

To establish fraudulent suppression, Defendants must establish: 1) a duty on the part of Plaintiff to disclose an existing material fact; 2) suppression of the fact by Plaintiff; 3) Plaintiff had actual knowledge of the fact; 4) Plaintiff's suppression of the fact induced Defendants to act; and 5) Defendants suffered actual damage as a proximate result of acting or of not acting. See, e.g.,

Brock v. Baxter Healthcare Corp., 96 F. Supp. 2d 1352, 1359 (S.D. Ala. 2000); Ex Parte Household

Retail Servs., Inc., 744 So. 2d 871, 879 (Ala. 1999); First Ala. Bank of Montgomery, N.A. v. First

State Ins. Co., 899 F.2d 1045, 1056 (11th Cir. 1990).

There is simply no evidence indicating that Plaintiff suppressed any material facts, regarding

the processing of Defendant Agee's claim, that induced Defendants to act and thus suffer harm.  The

record reveals that Plaintiff was in regular communication with Defendants with regard to the claim,

see supra, and moreover, that Plaintiff paid Defendants during the processing of the claim even

though it issued three "reservation of rights" letters.  Additionally, Plaintiff disclosed that it was

investigating the claim due to Defendant Agee's misrepresentation in a 2004 insurance application

as early as October 24, 2007 – just a few weeks after the loss was first reported.  Defendant Agee

even spoke to Fimiano via telephone on October 25, 2007, about this reservation of rights, and

Fimiano expressly told Defendant Agee that the reservation was based upon his failure to disclose

his prior 2003 fire loss on the insurance application.  (Doc. 33 at Ex. I at 44-45).  Plaintiff issued a

second "reservation of rights" letter on January 9, 2008, to reiterate this fact and remind Defendant

Agee that it was continuing to adjust the claim pursuant to a reservation of rights.  (Doc. 33 at Ex.

P).  Moreover, during the claims process, Plaintiff also disclosed that there was no evidence of some

large and costly content items being in the home at the time of the fire.  (Doc. 33 at Ex. H at no.

180).  On April 3, 2008, Plaintiff issued a third Reservation of Rights Letter to Defendant Agee after

this discovery.  (Doc. 33 at Ex. U).

A party faced with a motion for summary judgment on a fraudulent suppression claim must

offer substantial evidence as to *each* of the elements.  See, e.g., Cork v. Marriott Int'l, Inc., 426 F.

Supp. 2d 1234, 1246-47 (N.D. Ala. 2006) (citing Mason v. Chrysler Corp., 653 So. 2d 951, 954

(Ala. 1995)).  Defendants have failed to do so here.  Accordingly, Plaintiff's motion for summary judgment, with regard to Defendants' counterclaim for suppression, is **GRANTED.**

### 3.    <u>Bad Faith</u>

In the Counterclaim, Defendants asserted that Plaintiff failed to properly investigate or adjust the claim, refused to honor the insurance agreement and that the refusal to pay benefits was not based on any legitimate, arguable or debatable reason.  (Doc. 9 at 9).  Defendants also alleged that Plaintiff breached its obligation of good faith either by failing to undertake an investigation into the merits of their claim, or, after having ascertained its duties and responsibilities with respect to the claim, by breaching its obligation to pay and thus denying Defendants the benefit of their insurance contract.  (<u>Id.</u> at 10).  Defendants also alleged that Plaintiff's conduct – intentionally refusing to investigate the claim or intentionally refusing to pay the claim – represents malicious, fraudulent and oppressive conduct and evidences a conspicuous disregard for Defendants' rights.  (<u>Id.</u>).

Plaintiff moves for summary judgment on the basis of the presence of reasonably legitimate or arguable reasons for refusing to pay Defendants for the claim (the presence of debatable reasons). A "debatable reason" means one that is open to dispute or question.  <u>See</u>, <u>e.g.</u>, <u>State Farm Fire and Cas. Co. v. Balmer</u>, 891 F.2d 874, 876 (11th Cir. 1990); <u>Ex parte Simmons</u>, 791 So. 2d 371, 377 (Ala. 2000); <u>Nat'l Sec. Fire & Cas. Co. v. Bowen</u>, 417 So. 2d 179, 183 (Ala. 1982); <u>Chavers v. Nat'l Sec. Fire & Cas. Co.</u>, 405 So. 2d 1, 10 (Ala. 1981); <u>Aspinwall v. Gowens</u>, 405 So. 2d 134, 139 (1981) (Embry, J., concurring on reh'g).  The insurer need only present one debatable reason. <u>Bowen</u>, 417 So. 2d at 185 ("[T]o establish 'no lawful basis' for refusing to pay a claim, the plaintiff must show that the insurer lacked <u>any</u> legitimate or arguable reason for not paying the claim. If his evidence fails to eliminate <u>any</u> arguable reason for denying payment, any fairly debatable reason on

18

a matter of fact or a matter of law, he cannot recover under the tort of "bad faith refusal."(emphasis added)).

In its motion, Plaintiff contends that it has three, independent, arguable and fairly debatable reasons for contesting the Defendants' insurance claim such that summary judgment should be granted in their favor with regard to Defendants' bad faith counterclaim: 1) Defendant Agee's misrepresentation before the loss on the 2004 application; 2) Defendants' misrepresentation after the loss (contents claim); and 3) the suspicious nature of the fire (due to an unusual burn pattern). Additionally, Plaintiff asserts that it did not fail to properly investigate and adjust Defendants' claim nor did it delay processing the claim.  Plaintiff also points out that it has never issued a denial letter refusing to pay the claim.  (Doc. 33).

In response to Plaintiff's summary judgment motion, Defendants contend that Plaintiff has constructively denied the claim by  manufacturing debatable reasons to deny the claim.  Defendants also assert that Plaintiff treated their claim as an arson investigation from the outset, that Plaintiff has used flimsy, unreliable evidence to bolster a claim of intentional material misrepresentation in the application process, and that Plaintiff's reasoning for denying their claim has changed several times over the course of the investigation.  (Doc. 39).

Under Alabama law, there are two types of bad faith refusal to pay claims; "normal bad faith" and "abnormal bad faith."  See, e.g., Mut. Serv. Cas. Ins. Co. v. Henderson, 368 F.3d 1309, 1314 (11th Cir. 2004); Employees' Benefit Ass'n v. Grissett, 732 So. 2d 968, 976 (Ala. 1998); State Farm Fire & Cas. Co. v. Slade, 747 So. 2d 293, 306 (Ala. 1999).   To prove a "normal bad faith" claim for failure to pay an insurance claim an insured must show: 1) a breach of an insurance contract between the parties; 2) an intentional refusal to pay the insured's claim; 3) the absence of

any "reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);" 4) the insurer's actual knowledge of the absence of any legitimate or arguable reason; and 5) "if intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." Slade, 747 So. 2d at 304; Grissett, 732 So. 2d at 976; Blackburn v. Fid. and Deposit Co. of Md., 667 So. 2d 661, 667 (Ala. 1995). See also Henderson, 368 F.3d at 1314. In normal bad faith cases involving an insurer's refusal to pay an insurance claim, the Alabama Supreme Court has established the "directed verdict on the contract claim" standard. Blackburn, 667 So. 2d at 668. In other words, a plaintiff must show that he is entitled to a directed verdict on the breach of contract claim in order to have the claim of bad faith submitted to a jury. Grissett, 732 So. 2d at 976; Nat'l Sav. Life Ins. Co. v. Dutton, 419 So. 2d 1357, 1362 (Ala. 1982). Thus, courts review whether there is a "legally sufficient evidentiary basis" for a reasonable jury to find for Defendants on the breach of contract claim. Ala. R. Civ. P. 50(a). "Ordinarily, if the evidence produced by either side creates a fact issue with regard to the validity of the claim and, thus, the legitimacy of the denial thereof, the ['normal' bad faith] claim must fail and should not be submitted to the jury." Dutton, 419 So. 2d at 1362 .

However, the Alabama Supreme Court has recognized several types of unusual or extraordinary cases of bad faith that are not subject to the "directed verdict on the contract claim" standard. These bad faith cases are referred to as "abnormal". An abnormal bad faith claim can consist of: (1) intentional or reckless failure to investigate the plaintiff's claim; (2) intentional or reckless failure to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) creation by the insurer of its own debatable reason for denying the insured's claim; or (4) reliance

20

on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim.  Slade, 747 So.

2d at 306-07.  See also Singleton v. State Farm Fire & Cas. Co., 928 So. 2d 280, 283 (Ala. 2005).

Although not subjected to the "directed verdict on the contract claim" standard, ultimately an

abnormal bad faith claim can only prevail if the insured proves that he is entitled to benefits.  Slade,

747 So. 2d at 318 ("Although this Court has recognized several abnormal cases of bad faith, that

recognition did not eliminate the requirement that the plaintiff prove an entitlement to benefits under

the insurance policy.").

In the instant case defendant has limited his claim to an "abnormal" bad-faith claim.

Specifically, while Defendants' Counterclaim originally appeared to allege both a normal bad faith

and abnormal bad faith claim, in response to Plaintiff's motion, Defendants assert only a claim for

abnormal bad faith.  (Doc. 39).  Notably, through their response Defendants also narrowed their

counterclaim to the singular assertion that Plaintiff manufactured a debatable reason to deny the

claim (i.e., the third type of abnormal bad faith).  (Doc. 39 at 6-10).

The third type of abnormal bad faith claim, creation by the insurer of a debatable reason to

deny claim,  was first recognized in  Jones v. Alabama Farm Bureau Mutual Casualty Co., 507 So.

2d 396 (Ala.1986).  In Jones, the insurer initially denied the claim based solely on a statement

allegedly made by the insured regarding the cause of the damage (an uncovered event); however,

the insured denied making the statement.  Id. at 400.  The Court held that, "[p]recluding a plaintiff's

bad faith action by application of the 'directed verdict on the contract claim' test when the disputed

factual issue arises solely from a contradicted oral conversation between the insurer and the insured

or a third person puts too onerous a burden on the plaintiff. Moreover, it would frustrate the purpose

of the bad faith action by allowing an insurer simply to misrepresent the content of an oral

conversation to avoid liability."   Id. at 401.   Thus, an insurer is said to have "created" a factual issue "when the allegedly disputed factual issues arise solely from the statements of [the insurer or its agent]." United Am. Ins. Co. v. Brumley, 542 So. 2d 1231, 1236 (Ala. 1989).

As a basis for contesting the insured's claim, Plaintiff asserts that in the 2004 oral application interview, Defendant Agee misrepresented to Ericka Jackson [insured's agent] that he had not experienced a loss in the last three years.   The insured says he was not asked whether he had a prior loss.   The insurer says the insured was asked and failed to disclose the prior fire loss (a fire at another residence in October 2003).   This factual dispute falls squarely within the third type of abnormal bad faith claim, that is, the allegedly disputed factual issues arise solely from the statements of the insurer or its agent.   Thus, if this alleged misrepresentation was the sole reason for denying the claim,[7] the insured could survive summary judgment on their abnormal bad faith claim.

However, the insurer has propounded two additional purportedly "debatable" reasons for not paying the claim; neither of which rests on factual issues "created" or "manufactured" by the insurer. First, as recognized by both parties, a factual dispute exists with regard to the contents in the residence at the time of the fire.   Plaintiff asserts that "[a]t least, there is debatable evidence that the items [Defendant Agee claims were in the house] were not in the house[,]" and that "Agee misrepresented to State Farm the items that were in the house at the time of the fire."   (Doc. 34 at 6, 10).   In contrast, Defendants assert that all items listed in the sworn Proof of Loss forms were in

---

[7] An insurance company's denial of a claim may be either actual or constructive. Slade, 747 So. 2d at 317 n. 6. "In Alabama, a plaintiff can establish a constructive denial in two ways: '(1) by showing that the passage of time is so great that the delay alone creates a denial; or (2) by showing sufficient delay in payment coupled with some wrongful intent by the insurance company.' " Id. (citation omitted).   Under the facts of this case, the passage of time of nineteen months supports a finding of a constructive denial of full benefits.

the home at the time of the fire and were completely destroyed by the fire, and moreover, that due to the severe nature of the fire (no attempts were made to extinguish it), that combustible and noncombustible objects were reduced to small fragments that were nearly impossible to identify.

Plaintiff bases its dispute of the insured's contents claim primarily on the findings of their cause and origin experts.  Both Deese and Kennedy reported that they found no evidence (remains/debris) of certain items.  For example, there was supposedly no evidence found substantiating the loss of a 32-inch television, a 55-inch television, a 61-inch television, jewelry and a pool table.  (Doc. 34 at 6, 10; Doc. 44).  See also (Doc. 33 at Ex. H at no. 179, at Ex. J; Doc. 39 at Ex. H at 35-36, 39). Because this evidence is grounded in physical evidence and not merely contradictory statements between the insurer and insured, it is not a situation where the insurer has "created" a factual issue, as that term is used in the context of abnormal bad faith claims.

Moreover, the insurer also claims that the fire is suspicious due to an "unusual burn pattern on the steps leading into the house[]" and that, coupled with Defendant Agee's prior fire loss on another home, "[t]he totality of the evidence provides State Farm with a debate that the fire was intentionally set." (Doc. 34; Doc. 44 at 12).  In contrast, the insured asserts the fire inspectors found no evidence of arson and that the insurer's own representative testified that based on their expert's report they had no evidence to support a claim of arson.  (Doc. 39 at 9).  This dispute also does not support an abnormal bad faith claim based on the insurer "creating" a factual issue because the factual dispute does not arise solely from the statements of the insurer or its agent.  Rather, the factual dispute arises from circumstantial evidence of a prior fire loss incurred by the insured and physical evidence at the scene.

23

**IV.**    <u>**Conclusion**</u>

Based upon the foregoing, Plaintiff's Motion for Partial Summary Judgment with regard to Defendants' Counterclaims for bad faith, suppression, misrepresentation and negligent claim handling  is **GRANTED** and Plaintiff's Motion to Strike is determined to be **MOOT**.

**DONE** and **ORDERED** this the <u>**20th**</u> day of **May, 2009.**

/s/ Kristi K. DuBose
**KRISTI K. DUBOSE**
**UNITED STATES DISTRICT JUDGE**